Law Office of Mark Boling
Mark Boling, State Bar No. 101589
maboling@earthlink.net
21986 Cayuga Lane
Lake Forest, CA 92630
(949) 588-9222
(949) 588-7078 [fax]


Clint Krislov / M. Reas Bowman
clint@krislov.com / reas@krislovlaw.com
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker, Ste. 1350
Civic Opera House
Chicago, Illinois 60606
(312) 606-0500
(312) 606-0207 [fax]
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| MADELYN MAHFOOD,<br><br>        Plaintiff(s),<br><br>            v.<br><br>QVC, Inc., et al.<br><br>        Defendants. | Case No. SACV 06-0659-AG (ANx)<br>Cmplt Fld: 6/16/06 – CLASS ACTION<br><br>PLAINTIFF'S REPLY TO QVC'S<br>OPPOSITION PLAINTIFF MAHFOOD'S<br>MOTION FOR PRELIMINARY<br>INJUNCTION (REDACTED)<br><br>Date: June 16, 2008<br>Time: 10:00 a.m.<br>Ctrm: 10D  714-338-4757<br>Trial Date: 2/23/09 |

/ / / / /

# TABLE OF CONTENTS

I.  FACTUAL BACKGROUND ........................................................................ 1

II.  ARGUMENT ......................................................................................... 5

    A.  This Motion Is Timely Presented ............................................... 5

    B.  Mahfood Has Standing To Seek Injunctive Relief ....................... 6

    C.  Mahfood Satisfies the Requirements for a Preliminary Injunction ...... 7

        1.  A Prospective Threat of Harm Continues to Exist .................... 7

        2.  Mahfood is Likely to Succeed on Her CLRA Claim ................. 9

            (a) QVC's Retail Values Constitute False or Misleading Statement of Fact .................................................................. 10

                (i) The Findings of QVC's Expert are Inadequate ......................... 11

                (ii) Altobelli's Cost Approach to Valuing the Mahfood Products Is Valid ............................................................ 15

                (iii) Altobelli's Cost Approach to Valuing the Mahfood Products Is Appropriate ................................................... 16

                (iv) Altobelli's Application of the Cost Approach to Valuing the Mahfood Products Is Reliable ............................................ 16

                (v) QVC's Method of Deriving Retail Values is Misleading and Actionable Based on QVC's Retail Value Disclosures ..... 17

                (vi) QVC's Method of Determining Retail Values is Inadequate . 20

            (b) QVC's IP Disclosures Constitute False or Misleading Statements of Fact ................................................................. 21

            (c) Mahfood Relied Upon the Comparative Pricing Disclosures ............. 23

            (d) Mahfood Has Suffered the Requisite Damage Under Her CLRA Claim ........................................................................... 26

            (e) Mahfood Can Prove Injury in Fact Under the CLRA and/or UCL ..... 32

        3.  The Balance of Hardship Tips in Mahfood's Favor ................. 34

    D.  The Language of the Preliminary Order is Concise and Manageable 36

    E.  A Minimal Bond Is Required ............................................. 37

III.  CONCLUSION ................................................................................ 38

# TABLE OF AUTHORITIES

## OTHER AUTHORITIES

Black's Law Dict. (8th ed. 2004) .............................................................. 33

*In The Matter Of Pfizer Inc.*, 81 F.T.C. 23 *(1972)*............................................ 17, 18

James A. Hayes, Chairman Assembly Judiciary Committee, Report Relative to Assembly Bill No. 292, 1970 Assembly Journal 8464 ............................................. 9

*May Department Stores Co. v. Colorado* (Colo. 1993) 863 P.2d 967.................... 24

*May Dept. Stores v. State. Ex. Rel. Woodard* (Colo. 1993) 863 P.2d 967 ............. 22

Rest.2d Torts, § 546 .................................................................................. 24

## CALIFORNIA STATUTES

*Cal. Civ. Code* §1770.......................................................................... 9, 10, 29

*Cal. Civ. Code* §1780.............................................................................. 29

*Cal. Civ. Code* §1780 (a) (2) ...................................................................... 7

*Cal. Civ. Code* §1782............................................................................ 26

*Cal. Civ. Code* §3343 ........................................................................... 33

*Civ. Code* §1760.................................................................................. 28

## FEDERAL STATUTES

16 C.F.R. Sec. 233.3 .............................................................................. 21

FRCP Rule 65 (d) .................................................................................. 36

## FEDERAL CASES

*3 Point Distribution, LLC v. CafePress.com, Inc.*, No. SACV 07-0432 AG (C.D. Cal. 02/25/2008) ......................................................................................... 34

*American Financial Services Assn. v. FTC* (D.C. Cir. 1985) 767 F. 2d 957.......... 12

*American Fruit Growers v. United States*, 105 F.2d 722, 725 (9th Cir. 1939) ......... 8

*American Home Products Corp. vs. F.T.C.,* 695 F.2d 681, 697 (3rd Cir. 1982) ... 19

*Atchison, Topeka and Santa Fe Railway Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981) ........................................................................................................................ 8

*Burlington Northern Ry. Co. v. Bair*, 957 F.2d 599, 602 (8th Cir. 1992) .................. 8

*Chamberlan v. Ford Motor Co.*, 359 F. Supp. 2d 1138, 1147 (N.D. Cal. 2005) .... 31

*Chavez v. Blue Sky Beverage Co.*, 2007 WL 1691249 (N.D. Cal. June 11, 2007) . 32

*F.T.C. v. Colgate-Palmolive Co.* (1965), 380 U.S. 374............................................ 18

*F.T.C. v. Colgate-Palmolive Co.* (1965), 380 U.S. 374,........................................... 29

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985) ... 20

*FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103 (9th Cir. 1994) ................................. 25

*Glen Holly Ent. V. Tektronix Inc.*, 100 F. Supp. 2d 1086, 1096 (C.D. Cal. 1999).. 23

*In re All Terrain Vehicle Litig.*, 771 F.Supp. 1057, 1061 (C.D. Cal. 1991)............ 23

*Kraft, Inc. v.  F.T.C.* (7th Cir. 1992) 970 F.2d 311, cert. denied, 507 U.S. 909 (1993) 37

*Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 325 (7th Cir. 1992).......................................... 20

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004)............................................ 23

*McNeilab, Inc. v. American Home Products Corp.*, 501 F. Supp. 517, 525 (S.D.N.Y. 1980) ....................................................................................................................... 23

*Michenfelder v. Sumner,* 860 F.2d 328, 337 (9th Circuit 1988) ............................... 6

*Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 671 (7th Cir. 1967) ..................... 25

*Reno Air Racing Ass'n., Inc. v. McCord,* 452 F.3d 1126, 1132 (9th Cir. 2006) ..... 36

*Sears, Roebuck and Co.*, 95 F.T.C. 406, 518 (1980), affirmed, 676 F.2d 385 (9th Cir. 1982) ....................................................................................................................... 25

*Thompson Medical Co. vs. F.T.C.* (D.C. cir. 1986) 791 F.2d 189............................. 19

*Thompson Medical Co.*, 104 F.T.C. 648, 839 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987) .............................................................. 12

*Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir.) ........... 8

*Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1337 (9th Cir. 1995)37

*U.S. v. Estate Preservation Services*, 202 F.3d 1093, 1098 (9th Cir. 2000) ............ 8

## CALIFORNIA CASES

*Akkerman v. Mecta Corp., Inc.* (2007) 152 Cal.App.4th 1094 ................................. 7

*Aron v. U-Haul Co. of Cal.* (2006) 143 Cal. App. 4th 796 ...................................... 6

*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744 ................................................. 33

*Blackman v. Howes* (1947) 82 Cal.Ap.2d 275 .................................................. 19

Broughton v. Cigna Healthplans (1999) 21 Cal.4th 1066 ...................................... 26

*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663 .................. 32

*Freeman v. Gallery*, No. E039614 (Cal. App. Dist.4/2 11/08/2007) ..................... 33

*Frieman v. San Rafael Rock Quarry, Inc.* (2004) 116 Cal.App.4th 29 ................... 7

*Hogya v. Superior Court* (1977) 75 Cal.App.3d 122 ......................................... 26

*IT Corp v. County of Imperial* (1983) 35 Cal.3d 63 ......................................... 7, 35

*Kagan v. Gibralter Sav. and Loan Assn.* (1984) 35 Cal.3d 582 ............ 26, 27, 30, 31

*Knight v. Superior Court* (2005) 128 Cal.App.4th 14 ........................................ 32

*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635 ................................. 32

*McMahon v. Grimes* (1929) 206 Cal. 526 ....................................................... 19

*Meyer v. Sprint Spectrum L.P.*, 150 Cal.App.4th 1136 (Cal.App. Dist. 4, Div. 3 05/17/07) ...................................................................................................... 29, 30

*National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* (2003) 107 Cal.App.4th 1336 ................................................................................. 20

*Paul v. Wadler* (1962) 209 Cal.App.2d 615 ...................................................... 8

*Perkins, v. Ketchum* (1962) 322 Cal.App.2d 245 .............................................. 19

*Pollak v. Staunton* (1930) 210 Cal. 656 .......................................................... 19

*Porter v. Fiske* (1946) 74 Cal.App.2d 332 ....................................................... 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Stout v. Turney* (1978) 22 Cal.3d 718 ........................................................ 33

*Teague v. Hall* (1916) 171 Cal. 668 ........................................................ 19

*United Farm Workers of America v. Dutra Farms* (2000) 83 Cal.App.4th 1146 ... 29

*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686 ................................. 26

*Wang v. Massey Chevrolet* (2002) 97 Cal.App.4th 856 ........................................... 27

*Wilens v. TD Waterhouse Group, Inc.*, (2003) 120 Cal.App.4th 746 ..................... 30

*Wind v. Herbert* (1960) 186 Cal.App.2d 276 ........................................................ 8

# I.   FACTUAL BACKGROUND

Plaintiff Mahfood presents this motion in a timely manner after closing the pleadings and conducting sufficient discovery to warrant the relief sought.  The matter is currently set for trial February 23, 2009 (which may be further extended depending on Plaintiff's anticipated Motion for Class Certification).

Plaintiff Mahfood entered into transactions with QVC for the purchase of three jewelry products, J84472 and J54110 in December 2005 and J09332 in March 2006 ("Mahfood products") after viewing and in reliance upon QVC's comparative pricing disclosures for each product  [Declaration of Madelyn Mahfood filed with moving papers ("Mahfood Dec."), ¶¶ 2-13 & 20].

At the time of receipt, Mahfood thought each of the products she received was cheaper than what she paid QVC.  Mahfood got upset when she received the third QVC product and was over-charged.   She complained and sought legal advise from her brother and ultimately contacted Mr. Boling [Supplemental Declaration of Mark Boling ("SDB"), ¶ 7(a-c)] She filed this lawsuit in an attempt to stop the deceptive practices alleged in the pleadings.  [Mahfood Dec., ¶25]

The relationship between Plaintiff Mahfood, her brother James Mahfood and Plaintiff's counsel Mark Boling does not absolve QVC for its alleged wrongdoing in this case.  At the time of referral of this matter to Boling, no on-going cases existed between Mr. Mahfood and Mr. Boling.   Mr. Mahfood primarily acted as Boling's counsel for the enforcement of federal TCPA and corresponding CLRA violations. This is a professional business relationship.

Mr. Mahfood had an attorney/client relationship with Madelyn Mahfood and then she was referred to Mark Boling who had an attorney/client relationship with Madelyn Mahfood.  He had no conversation with Boling before March 2006 regarding QVC. He first learned of Madelyn Mahfood's QVC purchases after her last purchase. Madelyn Mahfood came to him seeking legal advice, not as a brother. He referred Madelyn Mahfood to Boling sometime in March 2006. He has no referral fee or fee splitting

1  agreement with Boling on this matter. [SDB, ¶ 9(a-f)]

2       Plaintiff Mahfood's involvement with Mr. Mahfood's legal practice is minimal.

3  She works once a month with her brother who is an attorney primarily handling the

4  bookkeeping, collect the rents, allocate the income, and hire maintenance people for a

5  property management company and she also does the bookkeeping and order supplies

6  for her brother's law practice. [Declaration of Mark Boling filed Under Seal with

7  moving papers ("BD"), ¶ 98 (c)]

8       QVC presents no evidence that Mahfood will never purchase from QVC again.

9  She continues to be a California consumer exposed to QVC's comparative pricing

10  disclosures on QVC Media.  The details of the policies and procedures for substantiating

11  and/or making these disclosures are kept secret and subject to change.

12       Mahfood had not previously seen the evidence of QVC TV programming and/or

13  relevant web pages downloaded in 2004 from QVC's Internet website (collectively

14  "QVC Media") produced by her attorney.  [SDB, ¶ 7(d)]

15       The timing of the pre-litigation notice sent to QVC was reasonably made after all

16  necessary facts had been discovered based on Mahfood's purchases.

17       QVC's eventual offering of the Mahfood products at the QVC Price is of no

18  significance, since the issues involve the Retail Value disclosures and the unreasonably

19  extended length of time that the product is initially offered for sale at the Introductory

20  Price ("IP").

21       QVC's decision to no longer offer the Mahfood products for sale is also of no

22  significance because the nature and scope of this litigation extends to QVC's

23  comparative pricing practices and for all its jewelry items.

24       Evidence of the purported comparative products to the Mahfood products is

25  deficient because these other comparable products are not substantially similar and/or

26  are from different avenues of distribution, which would exempt their inclusion into a

27  modal average under the market data approach.  Making such comparisons by a QVC

28  customer would require special knowledge in the analysis of the same or substantially

1    similar products and incur significant costs, which is why a consumer expects the

2    retailer to have adequate substantiation before disclosing its comparative pricing.

3    [Altobelli Dec., Exh. 2, Altobelli Expert Report, *Opinions & Basis* ("*AOB*"), ¶ 11]

4           Mr. Altobelli's inability to locate other suitable comparable items to the Mahfood

5    products in retail stores and/or in catalogs was primarily based on his understanding and

6    experience regarding the differences in the quality of suitable comparable products and

7    avenues of distribution.  Jewelry items by other retailers within a different avenue of

8    distribution are priced on a single unit being offered for sale and/or with a provenance

9    (high-class retailer) and therefore the markup would reflect the necessity of obtaining a

10   suitable higher profit margin.  Also, purported comparable jewelry at high-end stores

11   carry a different and higher value because of the store and/or brand recognition, as even

12   QVC's expert confirms, *infra*. [SDB, ¶ 5(q), (t)]  Conversely, the avenue of distribution

13   matters because mass merchandisers can sell with lower profit margins.  [SDB, ¶ 5(e),

14   (y), (aa)]

15          Mr. Altobelli's subsequent appraisal under the cost approach of the Mahfood

16   products provides the best historical evidence of their retail value at the time of

17   purchase.  His figures take into consideration the substantially similar quality of the

18   items and the appropriate avenue of distribution that QVC, as a mass merchandiser

19   would compete for customers.  [SDB, ¶ 5 (y), (ee)]

20          It is misleading for QVC to tell a customer what the retail value of a piece of

21   jewelry is at Tiffany's or a specialty store when the customer is not comparative

22   shopping at those establishments. It is undisputed by both parties' experts that the

23   branding of high-end items adds value to these otherwise-comparable products. [SDB, ¶

24   5 (j), (s)] Moreover, QVC regularly disregards qualitative aspects of the purported

25   comparables because the comparable product needs to be personally inspected. [*AOB*, ¶

26   11]  Thus, it is misleading for QVC to tell a customer what the retail value of a piece of

27   jewelry is at other retailers when QVC has not adequately substantiated that the other

28   products are substantially similar for comparison.

No significant sales by other retailers exist for the Mahfood products. [*AOB*, ¶5] The only identical comparable item of the Mahfood products that Mr. Underwood has obtained was from QVC's vendor, Relios, who has sold only the product at retail to Mr. Underwood. The single retail sale by Relios to Mr. Underwood is not adequate for determining a comparison Retail Value by a modal average.

The appraisals of the Mahfood products by Michael Cortez dated July 9, 2006 [Declaration of Robyn Levitan filed with QVC's opposition ("Levitan Dec."), Exh. S] considered the local Newport Beach, CA marketplace at the time of the appraisal and was based on the cost of replacing a <u>single item</u> for insurance purposes. Again, this criterion is different than establishing the Retail Value for a mass merchandiser. The higher appraisal amounts (which were still significantly lower than QVC's disclosed Retail Values) are less valid for purposes of determining the Retail Value for the Mahfood products at the time of purchase.

QVC's inadequate Retail Value substantiation by the category shop or mini-shop is a factual ground for finding the Retail Value disclosures are likely to mislead a reasonable consumer in violation of the consumer protection statutes separate and distinct from analyzing the disclosed retail value for each jewelry product in comparison to its prevailing market price at the time of disclosure.

QVC's very limited use of a "mini-shop" for jewelry items is tainted with the same inadequacies as its category shops because the QVC employee is not able to handle the product, nor has the special skill to analyze the product's quality to determine if the comparable product is substantially similar to the QVC product for purposes of comparison. [*AOB*, ¶ 11]

QVC's category shops deficiencies have been extensively discussed in Mahfood's moving papers and supporting papers. QVC attempts to cloud the fact that its retail values are arbitrary by stating that QVC uses "conservative" methods to determine Retail Values.

4

[BD, ¶ 96 (uu-ww)]   With this arbitrary approach to changing the multiples, why even bother doing a category shop?

[BD, ¶ 96 (qqq); Balliet Declaration filed in support of QVC's opposition ("Balliet Dec."), ¶¶ 19-20]  The problems with having an IP air for a specific number of days that may <u>exist for years</u>. [BD, ¶¶ 96 (qqq) & 99]  While QVC stands to make a higher profit at the QVC Price, significant profits are made in volume sales, which are at the IP.

[BD, ¶ 96 (hhhh)] Thus the policy of having the product eventually offered for sale at the QVC Price is moot.  The statistics of products being offered at the QVC Price are of no significance because the issue is the unreasonably extended time period that products are disclosed at the IP.

While all QVC jewelry products are purportedly treated different, QVC conducts its substantiation/monitoring for Retail Values and its comparative pricing disclosures in a **uniformed** manner [BD, ¶ 96 (cc-jj)]. QVC's argument that some products are disclosed without a Retail Value or without IP or at another discount price is of no significance because those other items are not at issue for purposes of this injunction. Any changes in the final multiplier for a category shop continues to be based on the same inadequate substantiation and/or subjective determination by the Retail Coordinator.  The IP disclosures continue to be made for an unreasonably extended period of time and are therefore misleading [*AOB*, ¶ 30-31].

[Balliet Dec., ¶¶ 15, 19, 20],                          [BD, ¶ 96 (hhhh)].  At which time they are never offered for sale at the QVC price.

## II.    ARGUMENT

### A.    This Motion Is Timely Presented

This Court has granted five extensions of the Scheduling Order because of the protracted litigation during the pleading stages and/or the Magistrate Judge's Discovery Order to not allow discovery until the pleadings were closed [BD, ¶¶ 5-22, 55]. Discovery has steadily progressed regarding Plaintiff's individual and/or class claims [BD, ¶¶ 23-84]. Plaintiff's diligent prosecution of this case establishes that no delay exists in seeking the requested relief. As discussed *infra*, a threat of harm continues to exist to warrant the immediate issuance of the preliminarily injunction to stop the deceptive practices in violation of the CLRA and/or UCL. The issuance of a suitable injunction at this stage of litigation will hasten the resolution of this matter and conserve judicial resources.

QVC's assertion that the hearing on the preliminary injunction can be consolidated with the trial, fails to distinguish that *FRCP*, Rule 65 (a) (2) involves advancing the trial date, not delaying the hearing on the preliminary injunction. (See, QVC's case citation - *Michenfelder v. Sumner,* 860 F.2d 328, 337 (9th Cir. 1988). Justice delayed is justice denied.

## B.    Mahfood Has Standing To Seek Injunctive Relief

As discussed *infra*, Mahfood has satisfied the standing requirements under the CLRA for seeking injunctive relief because she has suffered damage as a direct result of the alleged wrongdoing to be enjoined. *See Aron v. U-Haul Co. of Cal.* (2006) 143 Cal. App. 4th 796, 802.

QVC reliance on the *Deitz*, *Strickrath* and *Cattie* cases is inapposite. The consuming public, including Mahfood as a consumer, are currently exposed to an immediate and future threat of harm based on the on-going clandestine comparative pricing business practices that QVC maintains under seal with the court and hidden from the consuming public by its operations. The frequency of Mahfood's Internet purchases does not disqualify her as a consumer. As discussed *infra*, this threat of harm is sufficient to warrant the issuance of an injunction.

To the extent that Mahfood seeks injunctive relief under *Cal. Civ. Code* §1780 (a)

(2) for the same alleged wrongful business practices involving other consumers likely to be misled by the comparative pricing disclosures, the California Supreme Court supports the position that her individual CLRA claim acts as a <u>representative action</u> without the necessity of seeking class certification. *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066. (See, Moving Papers, 21:23-24:19)

Plaintiffs who prove they have standing and a meritorious case may seek injunctive relief on behalf of the public by using "the streamlined provisions of the UCL" **without the need to certify a class**. *Akkerman v. Mecta Corp., Inc.* (2007) 152 Cal.App.4th 1094, 1104 citing *Frieman v. San Rafael Rock Quarry, Inc.* (2004) 116 Cal.App.4th 29, 38 - streamlined procedure, tailored to allow an expeditious remedy for **terminating unfair competition**, is the purpose of the UCL.

### C.   Mahfood Satisfies the Requirements for a Preliminary Injunction

As discussed below, Mahfood presents a convincing combination argument to satisfy the requirements of a probable success on the merits and the possibility of irreparable harm, while further establishing her alternative position that serious questions are raised in this case and the balance of hardship tips in her favor for issuance of the preliminary injunction for company-wide relief.

### 1.   *A Prospective Threat of Harm Continues to Exist*

The CLRA legislative enactment specifically authorizes issuance of injunctions under *Civil Code* §1780 (a) (2). The California Supreme Court has determined that "where the legislative body has specifically authorized injunctive relief against the violation of such a law, it has already determined (1) that **significant public harm** will result from the proscribed activity, and (2) that injunctive relief may be the **most appropriate way** to protect against that harm." *IT Corp v. County of Imperial* (1983) 35 Cal.3d 63, 70.

Where an injunction is authorized by statute it is **unnecessary** for plaintiff to plead and prove the existence of the usual equitable grounds, irreparable injury and absence of an adequate remedy at law.  It is enough if the requirements of the statute are

satisfied. *Atchison, Topeka and Santa Fe Railway Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981) – *Private Plaintiff* seeking a preliminary injunction. (See also, *American Fruit Growers v. United States*, 105 F.2d 722, 725 (9th Cir. 1939); *Burlington Northern Ry. Co. v. Bair*, 957 F.2d 599, 602 (8th Cir. 1992) – limiting the traditional equitable discretion of the courts when violation of public policy statute[1] - *Private Plaintiff* seeking a preliminary injunction; *U.S. v. Estate Preservation Services*, 202 F.3d 1093, 1098 (9th Cir. 2000) ("The traditional requirements for equitable relief need not be satisfied since Section 7408 expressly authorizes the issuance of an injunction.") (citing *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir.), cert. denied, 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983) – Taxpayer suit).

The theory is that when a legislative body has authorized the injunctive remedy for the violation of a statute, it has determined as <u>a matter of law</u> that irreparable injury attends the violation of the statute. *See Burlington Northern R. Co. v. Bair*, 957 F.2d 599, 601-602 (8th Cir. 1992) (citing *U.S. v. City of San Francisco*, 310 U.S. 16, 31 (1940); *Atchison, T. and S.F. Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981)). Thus, where agencies of the federal government have been given the right to apply for injunctive relief in the public interest, the courts do not require a showing of irreparable injury. The courts of this state [California] have adopted similar reasoning, that is, where an injunction is authorized by statute, a violation thereof is good and sufficient cause for its issuance (*Porter v. Fiske* (1946) 74 Cal.App.2d 332, 338; see also *Wind v. Herbert* (1960) 186 Cal.App.2d 276 – *Private Plaintiff*). *Paul v. Wadler* (1962) 209 Cal.App.2d 615, 625.

Although the government cannot file a claim under the CLRA, Mahfood may sue and seek available injunctive relief under the CLRA to enforce the statutory consumer

---

[1]     A Consumer Protection Action has long been judicially recognized to be vital to the public interest (*Vasquez vs. Superior Court* (1971) 4 Cal.3d 800, 808; *Beasley vs. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1418).

protection public policy to stop deceptive practices by invoking the above-mentioned court reasoning.[2]

Since the standard of proof for a CLRA claim is that the representations are "likely to mislead a reasonable consumer", Mahfood need not prove that she and/or other specific persons will actually be misled by the comparative pricing disclosures to issue a preliminary injunction.  QVC **continues** to do business in California and continues to disclose the comparative pricing on QVC Media.  Therefore, a significant public harm continues to exist for violations under the CLRA.  As discussed *infra*, Mahfood meets the "probability of success" prong for a preliminary injunction.

**2.**      ***Mahfood is Likely to Succeed on Her CLRA Claim***

As more fully discussed in the moving papers (2:7-16:23), these comparative pricing acts for the subject products are **likely to mislead** and **violate** *Cal. Civ. Code* §1770 (a) **(5)** [by not providing to the consuming public, including plaintiff, with the represented benefit of the unequivocal value, bargain and/or monetary savings in purchasing said QVC products],  (a) **(9)** [by advertising goods with intent not to sell them as advertised], and/or (a) **(13)** [by making misleading statements of fact concerning reasons for, existence of, or amounts of price reductions] **because**:

a)      The "Retail Value" i) is significantly in excess of and/or does not reflect the prevailing market price for the product, ii) is an objective establishment claim that has not been adequately substantiated prior to being disclosed on QVC Media, and/or iii) has not been timely monitored by QVC after its initial and on-going disclosure on QVC Media,

---

[2]      The Consumer Legal Remedies Act is **designed** to provide affirmative remedies for consumers which will protect them from unscrupulous business practices while insulating responsible businessmen from spurious or vexatious lawsuits.  This is **done by providing the consumer** a lawsuit for himself or on behalf of all others similarly situated consumers to rescind unfair business transactions, collect damages, and **stop future bad practices**.  James A. Hayes, Chairman Assembly Judiciary Committee, Report Relative to Assembly Bill No. 292, 1970 Assembly Journal 8464, 8465. [RJN No. 12]

1
2       b)      QVC does not make any significant sales and/or offers the product for sale
3   at the corresponding "QVC Price" for a significant and/or within a reasonable time
4   period in comparison to the IP disclosure and is therefore not the regular price of the
    product,

5       c)      The IP is disclosed for an unreasonably extended length of time during the
6   product's initial marketing cycle making the IP the regular QVC price and/or a
7   disguised on-going sale of a product that is no longer new, and/or

8       d)      QVC does not adequately disclose in a conspicuous manner on QVC Media
9   the material limitations to QVC's two or three-tier comparative pricing structure for the
10  products, as set forth in this paragraph.

11      Mahfood relied on QVC's representations of the Retail Value and IP in deciding
12  to purchase her products [Mahfood Dec., ¶¶ 15-17].   As discussed *infra*, Mahfood
13  suffered damages as a direct result of the representations.

14      *(a) QVC's Retail Values Constitute False or Misleading Statement of Fact*

15      Mahfood's burden is to show that QVC's comparative pricing disclosures are
16  false or misleading and/or material omissions of fact exist regarding the same for her
17  CLRA claim.[3]   If the disclosed Retail Value for the Mahfood products were
18  significantly more than the prevailing market price for a suitable comparative product in
19  the same avenue of distribution as QVC at the time of her purchase, the Retail Value
20  would be misleading.

21
22
23  ―――――――――――――――――
24  [3]     The court's 2/7/07 Ruling on QVC's Motion to Dismiss Mahfood's CLRA claim
    does not negate the viability of the other subsections of Mahfood's alleged CLRA claim
25  under *Cal. Civ. Code* §1770 (a) (5), (9) and/or (13) because it only needed to reach a
    decision that one of the subsections of §1770 was adequately pled to deny QVC's
26  Motion to Dismiss.  The court held that "[a]lthough the Retail Value listings alone do not
    detail the amount of the price reduction, the Retail Value could combine with the
27  Introductory Price or QVC Price listing to establish "the existence of a price
    reduction."" (See 2/7/07 Order at p.5)  The court's further analysis of other subsections
28  of §1770 would have been unnecessary surplus for purposes of the Motion to Dismiss.

――――――――――――――――――――――――――――――――――――――― 10

Alternatively, Mahfood's burden of producing evidence is to establish that QVC's methods of substantiation their value and/or savings claims are inadequate prior to dissemination.  Evidence of, inter alia, QVC's failure to investigate or establish substantial sales by other principal retailers in the same avenue of distribution to determine Retail Value is sufficient.  Mahfood is not required to assume QVC's initial obligation of investigating the actual sales price of significant sales for each product item to meet its burden of producing evidence. If the disclosed Retail Value for the Mahfood products were not adequately substantiated and/or monitored before the time of her purchase, the Retail Value would be misleading.  If QVC failed to adequately disclose material facts regarding the Retail Value for the Mahfood products at the time of her purchase, the Retail Value would be misleading.  Any one of these factual situations forms the basis for Mahfood's CLRA claim.

### (i) The Findings of QVC's Expert are Inadequate

The retail sales prices for the Mahfood products that are presented by QVC's expert, Thom Underwood, do not reflect the prevailing market price of substantially similar comparables in the same avenue of distribution as QVC at the time of Mahfood's purchases.

After expending over $27,000 in his assignment to find and report on comparable products for just three QVC products purchased by Mahfood, Mr. Underwood attempts in his Gem & Jewelry Report dated 3/3/08 ["Underwood Report"] to substantiate the disclosed Retail Value of the Mahfood products by comparing only similar items offered for sale at their current regular selling prices from other retailers in higher-end avenues of distribution.  If the extensive field investigation as seen in the Underwood Report is required in an attempt to adequately substantiate the retail value of a product, it becomes evident why the law insists that the retailer and not the consumer undertake such efforts before disclosing a retail value.[4]

_____

[4]     [A]n unsubstantiated advertising claim is unfair because consumers are forced to bear the risk that the claim will turn out to be false; in addition, verification of the claim

The current regular selling prices are not suitable comparables to determine comparable Retail Value for the Mahfood products purchased in December 2005 and/or March 2006 [*AOB*, ¶ 7] because the current selling price of these jewelry items based on materials and labor has gone up since the time of Mahfood's purchases and therefore would be reflected in the retail selling price.   Furthermore, while retailers offer their products at discount "on-sale" prices many times a year [*AOB*, ¶ 9], Mr. Underwood fails to consider, recognize and disclose most of the comparable products at their "on-sale" price.

The Underwood Report acknowledges that "Branding" makes a difference in the consumer's perception of value and hence increases the price of an item in the marketplace, sometimes considerably (e.g. Tiffany's or Rolex).  [Underwood Report at p.6.]   Other notable distinctions in a consumer's perception of value, and hence an increase in price of an item in the market place, is the avenue of distribution in which the product is offered for sale. [*AOB*, ¶¶ 10 & 12] High-end retail chains like Bloomingdales or Nordstrom and specialty stores like Antiqua or Southwest Indian Foundation command higher prices based on higher Quality merchandise and/or retailer recognition. [SDB, ¶ 5(q), (r)]

The retailers considered for seeking comparable products by Underwood are not from the same mass merchandiser avenue of distribution as QVC.  These high-end retail chains and/or specialty stores offer items with low volume sales and high profit margin, which are inapposite to the value of the Mahfood products that are mass merchandised by QVC having high volume sales and lower profit margins.  Similar to the manner in

---

by consumers would generally entail <u>disproportionate</u> costs to verification by the advertiser.  (*American Financial Services Assn. v. FTC* (D.C. Cir. 1985) 767 F. 2d 957, 980, fn. 27.  <u>Subsequently</u> obtained documentation, even if it validates the claim, **does not rehabilitate** the unfair or deceptive act or practice. *See Thompson Medical Co.*, 104 F.T.C. 648, 839 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987).

which QVC conducts its category shops, seeking comparables at high-end retailers is used to over-inflate the data used to substantiate the mass-merchandised jewelry item.

Quality (e.g. craftsmanship, manufacturing techniques and materials) affects price in the marketplace. [Underwood Report at p.6.]   While the Underwood Report acknowledges that the existence of value characteristics distinctions of the purported comparable items need to be taken into consideration, the adjusted amount of such pricing consideration is not identified in the modal range analysis or in the individual comparable descriptions after the modal average analysis and no Appendix is attached to the Underwood Report.

Furthermore, the Underwood report does not state that the comparables are substantially similar for making a valid comparison to the QVC product.  Using any silver earring without substantially similar qualities is not a suitable comparable to a QVC silver earring, as also seen in the category shops, for purposes of establishing a retail value under the market data approach. When viewing the comparables for the Mahfood products in the Underwood Report, numerous distinctions are made in the Quality, such that their use as a suitable comparable is highly questionable.

With respect to the Relios liquid silver set (**J84472**), Mr. Underwood's underlying price data and approach to gathering the same is an insufficient basis for his modal range analysis.

Other than Mr. Underwood's single retail purchase, Relios has made no other retail sales of the Relios liquid silver set (J84472) from 2005 to the present. [BD, ¶ 90] No wonder because its over-priced at that amount.  Nevertheless, a single retail sale of the identical product from a high-end specialty retailer is insufficient data to base a modal average or prevailing market price for this jewelry item.  No other suitable comparables were found in national department stores or smaller chain stores. [Underwood Report, p.12, ¶ 3.]

Approach 1 & 2, Full Set Comparable [Underwood Report, p.12-13] is inadequate because the other products and pricing are not suitable for comparison under the market

data approach.  For example, no data exists to establish that Relios made any retail sales of the purported comparable Relios items and/or that the same items can be offered in the marketplace for substantially less [Altobelli Dec., Exh. 3]. As discussed above, Mr. Underwood made Relios' only retail sale of the liquid silver set. Therefore, Relios' designated selling price is not an indication of what amount a willing buyer would purchase the item for.   The full set comparable taken from the Southwest Indian Foundation presents no sales data for the selling price, no "on-sale" price, and as a specialty store is a different avenue of distribution.

Mr. Underwood's approach of doubling a single item or combining the individual values for each portion of the earrings and necklace set with purported comparables does not take into consideration the reduction in price that would occur for each item because of the jewelry item being offered as a set. For example, retailers understand the significant distinction of substantiating the retail value of a set item by adding the prices of each item together by disclosing the fact "If Sold Separately" ("ISS") as a notation the Retail Value disclosure. The consumer is made aware of this distinction in assessing the value of the bargain. The Underwood Report ignores this significant distinction in its analysis of its data.

With respect to the Sterling Amethyst & Lavender Jade Earrings (**J54110**), Mr. Underwood's underlying price data and approach to gathering the same is an insufficient basis for his modal range analysis.

The three items most comparable in Mr. Underwood's field research are taken from Antiqua, a small specialty chain store, which is a different avenue of distribution from QVC's mass merchandising outlet and therefore not suitable for comparison. [Underwood Report, p.17, ¶ 4]  The use of comparables with jadeite is to be excluded because the subject product did not have a jadeite bead, was very poor quality chalcedony quartz and can be obtained in the marketplace for substantially less. [SDB, ¶ 5(n), Altobelli Dec., Exh. 3]

With respect to the Nolan Miller's Dancing Hearts Drop Earrings (**J09332**) ("NM

14

earrings, Mr. Underwood's underlying price data and approach to gathering the same is an insufficient basis for his modal range analysis.

The Underwood Report identifies a branding value for the NM earrings costume jewelry that is made in CHINA. [Underwood Report, p.22, ¶2]   Nolan Miller's purported fame is that of a television costume designer from back in the 1980s [Underwood Report at p.7, ¶1], not as a jewelry designer in the United States or China. In researching the NM earrings branding issue, Mr. Altobelli found no appreciable value existed with this Nolan Miller brand. [SBD, ¶ 5(dd)]

The purported most comparable item #141 was located at Macy's having a trademark from Givenchy.  [Underwood Report, p.22, ¶ 5]  This comparable item is to be excluded because of its enhanced trademark value and higher-end avenue of distribution.  The purported excellent comparable item #141 was located at Bloomingdales.  [Underwood Report, p.22, ¶ 6]  This comparable item as well as the other comparables for the subject product are to be excluded because of its higher-end avenue of distribution.  The Underwood Report makes no mention of the geographic origin of the comparable offered for sale at Bloomingdales or the other comparable as made in China.

### (ii) Altobelli's Cost Approach to Valuing the Mahfood Products Is Valid

Mr. Altobelli spent 3 ½ hours looking for similar or identical products on-line and in catalogs and didn't come close.  [SDB, ¶ 5(f)]

The avenue of distribution matters because mass merchandisers can sell with lower profit margins.  In attempting to locate relevant market data, he opined that visiting stores would be worthless because it is a different avenue of distribution.  Mass merchandiser stores are Wal-Mart, possibly Sears, JC Pennys, or Costco, which do not typically handle merchandise of this type. [SDB, ¶ 5(h)] QVC should only be comparing itself to mass merchandisers for comparable advertising materials.  [SDB, ¶ 5(s)] QVC's retail value explanation is vague, ambiguous, confusing and does not reflect the

meaning of the Retail Value as a prevailing market price based on substantial sales for the same or substantially similar product in a representative number of communities where the product is offered for sale, which in this situation would be a nationwide mass merchandiser.  [BD, ¶ 96 (dddd), *AOB*, ¶¶ 7 & 8]

### (iii) Altobelli's Cost Approach to Valuing the Mahfood Products Is Appropriate

In order to arrive at the prevailing market price for the Mahfood products at the time of her purchase in December 2005 and March 2006, Mr. Altobelli used the cost approach method of appraisal. [*AOB*, ¶ 14; SDB, ¶ 5(a), (m)]  This approach was used because he was unable to locate any market data for the subject time period and this approach a viable alternative for appraising the products.  [SDB, ¶ 5 (b), (f-h), Altobelli Dec., Exh. 3]   Mr. Underwood's statement that he found substantially similar and comparable products is wrong because he is not using the same avenue of distribution at the time of Mahfood's purchases.  [SDB, ¶ 5(i), Altobelli Dec., Exh. 3]

### (iv) Altobelli's Application of the Cost Approach to Valuing the Mahfood Products Is Reliable

It is typical of the industry that mass merchandise items get a lower markup. The component prices come out of a catalog, which is a cost factor using singular items that do not take into consideration mass merchandising and multiples of the same thing, which there is major savings of 40-50 percent in numbers.  If the subject earrings were amethyst and jade, then amethyst and jade earrings in CA008 would not be a comparable because the amethyst and jade in CA008 were of a substantially higher quality.  Altobelli used that catalog page, but the earrings in question were a plated silver toned and not sterling silver or silver.  The particular item in the catalog page was sterling silver and had a triple keystone, which means it is one-third the actual shown price, or $17.00. Eliminating the fact that the subject earrings are not sterling and eliminating the fact that the catalog product has cubic zirconia, where the earrings in question were simulants, which mean that are not quite that good, Altobelli

16

subsequently came out with a number that was substantially less because of these disparities.  Altobelli opined that the earrings do not necessarily sell for $45, but is just the way the manufacturer shows the retailer what the cost is by having to deduct two-thirds off the price.   Most of the retailers in the business that do not manufacture themselves to any degree would probably put $47 on those earrings as a single item.  If they had sold them in silver tone, they would probably have put $45 on those earrings as a single item.  [SDB, ¶ 5(gg-jj)]

In Altobelli's book published a long time, the chart related to costs and markup times costs comes from Richard Drucker of the Guide publication, which Mr. Drucker no longer uses --- as a matter of fact, a couple of years ago Mr. Drucker has eliminated it from his publications because it's not valid anymore.  Altobelli used 0.5 instead of 3.0 as a markup in this case because the other was a typical markup by retail jewelers selling a singular item; where this is a mass merchandising with the mass merchandiser having the facility to deal directly with the source to eliminate added cost factors by middlemen.  [SDB, ¶ 5(x-y); Altobelli Dec., Exh. 3]

### (v) QVC's Method of Deriving Retail Values is Misleading and Actionable Based on QVC's Retail Value Disclosures

A failure to adequately substantiate a claim prior to its dissemination is **an unfair or deceptive act or practice**. [*See In The Matter Of Pfizer Inc.*, *81 F.T.C. 23* (1972)[5]

---

[5]   *In The Matter Of Pfizer Inc.*, *81 F.T.C. 23* (1972) [RJN No. 15], the Commission held that the significance of this particular case lies, therefore, not so much in the entry of a cease and desist order against this individual respondent, but in the resolution of the general issue of whether the failure to possess a **reasonable basis** for affirmative product claims constitutes an unfair practice in violation of the FTC Act. (*Id*. at p.73-74)
It is thus clear that the tests [efficacy of Un-Burn product] conducted by Pfizer **did not provide a reasonable basis** for the making of these performance claims. The tests were not adequate and well-controlled scientific tests conducted prior to the making of the efficacy representations." (*Id*. at p.67)
Fairness to competitors requires that the vendor have a reasonable basis for his affirmative product claims. A sale made as a result of an unsupported advertising claim **deprives** competitors of the opportunity to have made that sale for themselves.  (*Id*. at p.63)

and FTC Policy Stmt Re: Advertising Substantiation Program www.ftc.gov/bcp/guides/ad3subst.htm.] When QVC discloses a monetary savings claim or benefit for its products without adequate substantiation then the disclosed claim is deceptive. The comparative pricing disclosure is the representation and the inadequate substantiation is the premise for the deceptive practice. Mahfood viewed and relied upon QVC's comparative pricing disclosures as a material factor in deciding to purchase the Mahfood products [Mahfood Dec., ¶¶ 15-17]. Mahfood needs only to view and rely upon the Retail Value disclosure and not QVC's internal method of substantiation to be actionable. In fact, QVC hides its inadequate substantiation from the general public, which is why Mahfood's CLRA claim also has as its component a failure to conspicuously disclose material omissions of fact.

Contrary to QVC's assertion that a consumer's assumption cannot be the basis of a deceptive practice, when a factual, verifiable proposition is unequivocally asserted in the advertisement, the consumer is **entitled to assume** that the appropriate verification

---

This view finds direct support in the recent decision in *Leon A. Tashof* v. *F.T.C.* n14 There, the Commission found that a retailer falsely advertised that his products were available at **discount prices**. The Commission in effect ordered the respondent to stop advertising that he sold any product at a discount price unless he had a reasonable basis for such a claim. In view of this retailer's past history, the Commission prescribed a specific type of "reasonable basis" - the Commission ordered that the respondent, before advertising that he sells at discount prices, **must take a statistically significant survey** to demonstrate that **prevailing market prices** are substantially above respondent's prices. In affirming the Commission's decision, the Court expressly noted that this order subjected the respondent to civil penalties if the respondent advertises discount prices without having taken the survey, *even if the advertisement is true*. (*Id.* at p.63)

It has long been considered a deceptive practice to state falsely that a product ordinarily sells for an inflated price but that it is being offered at a special reduced price, **even if** the offered price represents the actual value of the product, and the purchaser is **receiving his money's worth**. *F.T.C. v. Colgate-Palmolive Co.* (1965), 380 U.S. 374, 387.

has been performed. [*American Home Products Corp. vs. F.T.C.,* 695 F.2d 681, 697 (3rd Cir. 1982).]

QVC asserts an implicit or explicit value and/or saving claim in its advertisement for the products based on the disclosure of a comparative price(s) in close proximity with the actual selling price. QVC's advertisement of such claims as the difference between the unequivocal "Retail Value", "QVC Price" and any other actual lower selling price for their products is an <u>objective establishment claim</u>. Expressed and implied establishment claims must have the level of support expressed or **implied** in the advertisement (*Thompson Medical Co. vs. F.T.C.* (D.C. cir. 1986) 791 F.2d 189, 194.)

A reasonable consumer, including Plaintiff, would interpret the Retail Value disclosure as the price that a significant number of sales had been recently made for each product by other principal competitors of QVC in California. [Mahfood Dec., ¶15] In this case, competitors of QVC are mass merchandisers [SDB, ¶ 5(s)] or E-tailers HSN and ShopNBC [BD, ¶ 96(t)]. By law and implicit in QVC's disclosure, QVC had an affirmative duty to adequately substantiate the Retail Value before disclosing the same to the general public, including Mahfood. The FTC's reasoning of the FTC Act provides a sound basis for the CLRA violations because the purpose of both enactments is to stop deceptive practices.

QVC's retail value explanation does not sanitize its deception.[6] This explanation on QVC's website is not conspicuously set forth on the product description web page this is viewed by the consumer, but hidden in the FAQ section of the website. Additionally, this explanation is infrequently aired on QVC TV programming.

---

[6]     The mere existence of an opportunity to investigate, or of sources of information, will not preclude the plaintiff from relying upon the misrepresentation. (*Teague v. Hall* (1916) 171 Cal. 668, 670; *McMahon v. Grimes* (1929) 206 Cal. 526, 536; *Blackman v. Howes* (1947) 82 Cal.App.2d 275, 280; *Perkins, v. Ketchum* (1962) 322 Cal.App.2d 245, 251)  For example, no obligation rests on a purchaser of stock to investigate books of a corporation to determine the truth of representations that cash payment had been made to corporation.  (See, *Pollak v. Staunton* (1930) 210 Cal. 656)

Moreover, an advertiser should not be permitted to continue to unlawful advertising claims by asserting that it has disclosed its method for deception. For example, if a product claims to cure cancer and the advertisement discloses that this claim is based on "clinical studies" that is later discovered to be based on Junk Science, the disclosure of a disclaimer on the validity of the "clinical studies" does not abolish defendant's liability for false advertising.   Thus, when advertising is false or misleading, disclosures will not eliminate the underlying deception. See, *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985); *Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 325 (7th Cir. 1992), cert. denied, 122 L. Ed. 2d 652, 113 S. Ct. 1254 (1993).

### (vi) QVC's Method of Determining Retail Values is Inadequate

On November 19, 2007, the Court held that Mahfood's CLRA claim based on her exhaustive allegations of inadequately substantiated Retail Values was viable.[7]   As more fully discussed in Mahfood's moving papers (9:27-14:28) and supporting declarations thereto, QVC's method of substantiating and/or monitoring its disclosed retail values are inadequate.

QVC's contention that Mahfood must show on an individual product basis that each product's retail value is overstated is wrong.   The aforementioned case law establishes that Mahfood's alternative burden is to show that QVC did not adequately substantiate its Retail Values prior to dissemination to state a deceptive practice claim. QVC's substantiates its disclosed retail values for jewelry items by uniform category shops. If the shops are inadequate, the retail value disclosure is misleading for each product in the category.   Mahfood has extensively shown that the category shops for the Mahfood products, which are typical of all QVC category shops, are inadequate.   Thus, all products disclosing a retail value based on a category shop is misleading.

QVC's reliance on the case of *National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* (2003) 107 Cal.App.4th 1336 is misguided.  *King Bio*

---

[7]   This 11/19/07 ruling did not express any opinion on the other factual or legal basis for her CLRA claim.

simply states that you must produce evidence that the specific product in question is advertised falsely or is misleading.  The plaintiff didn't do that; rather he relied on a general attack on homeopathic remedies. *Id*. at p. 1347.  Since there is a national Homeopathic Society sanctioned by the Feds that was not enough. *Id*. at p. 1348. In the instant case, Mahfood provides evidence of the misleading comparative pricing disclosures for the subject jewelry products based on QVC's uniformed practices. [BD, ¶ 96 (dd-kk), (pp-rr), (uu-ww), (qqq), *AOB*, ¶¶ 15-19, 21-22, 26, 29, 33-34]

QVC's reliance on the FTC regulation 16 C.F.R. Sec. 233.3 entitled "Advertising retail prices which have been established or suggested by manufacturers (or other nonretail distributors)" to defend their "Retail Value" substantiations is misplaced because QVC is **not** a manufacturer or other nonretail distributor, but a RETAILER, and therefore that regulation does **not apply** to this case.

### *(b) QVC's IP Disclosures Constitute False or Misleading Statements of Fact*

The court held that "[a]though the Retail Value listings alone do not detail the amount of the price reduction, the Retail Value could combine with the Introductory Price or QVC Price listing to establish "the existence of a price reduction."" (See 2/7/07 Order at p.5)

The disclosure of the IP for the Mahfood products is likely to mislead a reasonable consumer, including Plaintiff, **because** at the time of purchased the products were not new after the first date of exposure, and the IP was in fact the product's regular QVC price after being offered for an unreasonably extended length of time without first offering the product at the "QVC Price" and/or the IP acts as a disguised on-going sale. [*AOB* at ¶ 31]  The same scenario is true of other QVC products disclosed with an IP because the uniform policy is to disclose the product with an IP for far more than ten (10) consecutive days.

[BD, ¶ 96 (qqq)].

[BD, ¶ 96 (gggg)].

[BD, ¶ 96 (ppp)].  In the context of the IP viewer education spot (QVCC 2360), [BD, ¶ 96 (ttt)].

More than ten (10) consecutive days is considered an unreasonable period of time for QVC to offer a consumer product at an "Introductory Price" on QVC TV programming and/or QVC's Internet website before reverting the selling price to the product's regular "QVC Price".[8]  After that 10-day time period, the IP disclosure is likely to mislead a reasonable consumer, including Mahfood, that the product is new and/or still being introduced by the advertiser.  [*AOB*, ¶ 30]  Altobelli's experience in the retail jewelry business and common sense is the basis for rendering an opinion regarding a maximum of 10-days as the reasonable length of time that a consumer product is offered by a retailer at an introductory price before reverting to the product's regular price. [SDB, ¶ 5(k); AOB, ¶¶ 30-31]

[BD, ¶ 96 (zzzz)].  After ten (10) consecutive days of being offered for sale at the IP, the "Introductory Price" becomes the regular price for the product. [*AOB*, ¶ 30]  Thus, the QVC Price is fictitious as a regular price during this extended time period that the IP is disclosed. [BD, ¶ 96 (hhhh)]. [BD, ¶ 96 (wwww)]. "So take advantage of the introductory price when you see it" (QVCC 2360) is to

---

[8]    The 10-day period has also been used as an implicit introductory period in framing the injunction that was made by the trial court in the case of *May Dept. Stores v. State. Ex. Rel. Woodard* (Colo. 1993) 863 P.2d 967, 977 fn.21.

encourage the consumer to purchase the product at the introductory price [BD, ¶ 96 (bbbb)]. "It's our way of saving you even more money on some of our newer products" (QVCC 2960) is to encourage the consumer to purchase now as to wait for some period of time when it may be at a higher price, i.e., QVC price [BD, ¶ 96 (cccc)]. These QVC express statements convey QVC's understanding and intention in the implicit message inherent in the IP disclosures of the urgency to purchase the products as a monetary savings claim.[9]

Although QVC intended for consumers to make a hasty purchase based on the IP, no urgency existed to purchase item nos. J84472, J54110 and/or J09332 at the IP. At the time of Mahfood's purchase the IP for item nos. J84472, J54110 and/or J09332 was already disclosed on QVC Media for an unreasonably extended period of time. [Mahfood Dec., ¶¶ 3 & 9; See, BD, ¶ 99]

### (c) Mahfood Relied Upon the Comparative Pricing Disclosures

The trial court has the **best view of consumer perception**. See *McNeilab, Inc. v. American Home Products Corp.*, 501 F. Supp. 517, 525 (S.D.N.Y. 1980) (stating that "the court must . . . rely on its own experience and understanding of human nature in

---

[9] These specific factual statements intended to induce QVC customers into making immediate purchases are **very different than the puffery** cited in QVC's opposition brief at page 36. *See In re All Terrain Vehicle Litig.*, 771 F.Supp. 1057, 1061 (C.D. Cal. 1991) (defendants' alleged misrepresentations, such as use of the name "all terrain vehicle," was mere puffery because "a reasonable consumer would not interpret [it] as a factual claim upon which he or she could rely"); *Glen Holly Ent. V. Tektronix Inc.*, 100 F. Supp. 2d 1086, 1096 (C.D. Cal. 1999) (defendant-owners of a company had made general representations such as it was conducting "'high priority' development of a number of different products [which] "would be pursued full tilt,'" where the court found no representations a reasonable consumer would rely upon); *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004) (lender's representation that borrower would receive "prime rate" was mere puffery because court found specific congressional testimony showing how "prime rate" was a "murky, ill-defined term that rarely reflects the lowest rates available to corporate customers.") (citing Staff of House Comm. on Banking, Finance and Urban Affairs, 97th Cong., 1st Sess., *An Analysis of Prime Rate Lending Practices of the Ten Largest United States Banks* 3 (Comm. Print 1981)).

drawing **reasonable inferences** about the reactions of consumers to the challenged advertising").  [*May Department Stores Co. v. Colorado* (Colo. 1993) 863 P.2d 967, 980.]

It is **not** ... **necessary** that [a plaintiff 's] reliance upon the truth of the fraudulent misrepresentation be the **sole or even the predominant or decisive factor** in influencing his conduct.... It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision. (Rest.2d Torts, § 546, com. b, p. 103; See also comments to CACI No. 1907.)

At the time of ordering each of the QVC product items, Mahfood reasonably believed based on the disclosures of the three-tier comparative pricing for each of the subject products she ordered and/or the two or three-tier comparative pricing for other products offered for sale to the consuming public on QVC Media that she was getting and expected to receive a value bargain and/or a precise monetary savings in the purchase of each product, in an amount calculated as the difference between the Retail Value and the IP and/or the difference between the QVC price and the Introductory Price of each respective product items. [Mahfood Dec., ¶¶ 15 & 16]

Mahfood relied upon the uniformed comparative pricing disclosures for QVC jewelry products on QVC Media and the specific comparative pricing presentation on QVC's website for the specific corresponding items that she ordered in **making her decision** to purchase QVC product item nos. J84472, J54110 and/or J09332. [Mahfood Dec., ¶ 17]

Mahfood's ability to return the product is of no significance.  An opportunity to return the product within 30-days is the same as a money-back guarantee and is not a defense to deceptive advertising.[10]

---

[10]     Equitable defenses may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful conduct. It does not follow, however, that equitable considerations may not guide the court's discretion in fashioning the equitable remedies authorized by section 17203. *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 179.

"A **money-back guarantee is no defense** to a charge of deceptive advertising." *Sears, Roebuck and Co.*, 95 F.T.C. 406, 518 (1980), affirmed, 676 F.2d 385 (9th Cir. 1982); *Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 671 (7th Cir. 1967).

[T]he existence of a money-back guarantee is **insufficient reason as a matter of law** to preclude a monetary remedy allowing a seller to rely on a money-back guarantee as a defense would make the false advertising [laws] a nullity. Anything might then be advertised as long as unsatisfied customers were returned their money. For the same reasons, allowing such a guarantee to bar monetary relief would make the broad equitable remedial power [of the courts] a nullity. Because **even many unsatisfied customers will not take advantage of a money-back guarantee**, a company which has engaged in consumer fraud would be able to retain a significant portion of the proceeds simply by making a largely illusory money-back offer (internal citations omitted). *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103 (9th Cir. 1994).

For public policy reasons, the Federal Trade Commission, which has great expertise in advertising matters, and the courts, have found that a money-back guarantee is no defense to a false advertising.  If this was not so, ANY claim could be made, and an unscrupulous seller could sell ANY product, no matter how fraudulent, and simply argue that the customer could have returned the product.

Furthermore, many consumers will not bother to return the product and obtain a refund, and the QVC would profit from their dishonesty.  To hold otherwise would allow a loophole that would swallow EVERY advertising law or regulation.  To use an extreme example, a seller could sell bottled water with some food coloring, for $99 a bottle, as "An All-Natural Cancer Cure" with a 100% money back guarantee. The persons who were not cured would be dead, and would not apply for a refund.

Mahfood's rejection of QVC's refund offer for product J54110 during this litigation does not negate her existing CLRA claim. "The rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights." *Valle de Oro Bank v. Gamboa* (1994) 26

Cal.App.4th 1686, 1691 - citing *Seaboard Music Co. v. Germano* (1972) 24 Cal. App. 3d 618, 623; See also *Kagan v. Gibralter Sav. and Loan Assn.* (1984) 35 Cal.3d 582. Having filed this action and diligently prosecuting the same, Mahfood was not required to accept the refund offer made by QVC during litigation, which would have cause her to surrender an important and valuable right to her existing consumer protection claims against QVC.  To reason otherwise would allow any wrongdoer the opportunity to avoid justice during a pending litigation by "picking off" a representative and/or individual plaintiff.  Furthermore, Mahfood did attempt to mitigate her damages by timely sending the CLRA pre-litigation notice to QVC of the challenged comparative pricing disclosures in compliance with the requirements under *Cal. Civ. Code* §1782, which QVC ignored.

As stated *supra*, Mahfood's initial interest in seeking legal advise was prompted by QVC over-charging her purchase, which had nothing to do with her attorney.

### *(d) Mahfood Has Suffered the Requisite Damage Under Her CLRA Claim*

*Civ. Code*, § 1780, subd. (a) states "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act or practice underlined declared to be unlawful by section 1770 may bring an action against that person to recover actual damages, injunctive relief, restitution of property, punitive damages, and any other relief the court deems proper."  The CLRA provides for actions in which no remedial damages are sought [e.g. an injunctive relief, restitution or "any other relief which the court deems proper" (*Civ. Code* § 1780, subd. (a) (2), (3) and (4))].[11]

The proper criteria for asserting "damages" as a standing issue for a CLRA claim is alleging one or more of the laundry list of violations as set forth in *Cal. Civil Code*

---

[11] ( E.g. - See, *Hogya v. Superior Court* (1977) 75 Cal.App.3d 122, 138 - The (CLRA) act apparently contemplates class actions in which no damages are sought.)To the extent that Mahfood seeks equitable remedies under Civil Code §1780, her CLRA claim acts as a representative. [CLRA] relief is for the **benefit of the general public** rather than the party bringing the action. (See, *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1082.)

§1770. "As it is unlawful to engage in any of the deceptive business practices enumerated in section 1770, consumers have a corresponding legal right not to be subjected thereto. Accordingly, we **interpret broadly** the requirement of section 1780 that a consumer 'suffer[] any damage' to **include** the infringement of any legal right as defined by section 1770." (*Kagan v. Gibralter Sav. and Loan Assn.* (1984) 35 Cal.3d 582, 593; also cited in *Wang v. Massey Chevrolet* (2002) 97 Cal.App.4[th] 856, 869)  In the *Kagan* Case, the California Supreme Court specifically **rejected** Gibraltar's effort to equate pecuniary loss with the standing requirement that a consumer "suffer[ ] any damage." *Kagan* at p. 593.

While the issue before the Supreme Court in *Kagan* was whether the plaintiff had standing to bring a class action as its representative, the fact that *Civil Code* §1781 requires individual standing under *Civil Code* §1780 as a prerequisite to standing as a class representative means that the Supreme Court's determination on the individual standing issue was necessary to its determination.

In the instant case, Mahfood's contention that a consumer who suffers damage based on an infringement of any legal right as defined by § 1770 has standing to recover under a CLRA claim does <u>not</u> ignore the existence of harm to be actionable.

Section 1770 has inherent in its statutory language the existence of harm by expressly providing that the acts or practices set forth in *Civil Code* §1770(a) be undertaken by any person in a transaction.  Mahfood entered into a sales transaction with QVC for the purchase of the Mahfood products in reliance upon QVC's comparative pricing disclosures. The **existence of harm** is established by the action of Mahfood purchasing the QVC products based on QVC's alleged misconduct.

As discussed *infra*, QVC infringed upon Mahfood' legal rights derived under *Civil Code* §§1770 (a) (5) [benefits that do not exist], (9) [intent not to sell product as advertised] and (13) [making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions] to establish the requisite "damage" under *Civil Code* §1780 and to have standing to assert a CLRA claim.

27

QVC's unwarranted requirement of the existence of pecuniary damage to seek a CLRA claim is contrary to the **great weight of authority** established in the existing legal precedents on the standing issue of CLRA damages with the California Supreme Court's holding in the *Kagan* case and reinforced in the *Wang* case.  In the instant case, the *Kagan* Rule is already applied in the context of a consumer transaction (e.g. Mahfood purchased QVC products) that establishes the necessary harm, but **does not** require the consumer suffer any additional pecuniary damage for an actionable claim. (See, 3/26/07 Order)

The word "damage" as a standing issue under *Civil Code* §1780 is used in a very limited manner, which must be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection"  (*Civ. Code* §1760).  It becomes clear, in context, that the "any damage" standing requirement of the CLRA is fulfilled by the violation of one of the 22 business practices that are prohibited by §1770 <u>without</u> an "out of pocket loss" test.

For example, the CLRA prohibits "[d]isseminating an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message." *Civ. Code* §1770 (a)(22). Clearly when this statute is violated, the consumer who receives the prohibited phone call has suffered "damage", within the limited meaning of the CLRA, and has standing to sue and recover equitable relief. The "damage" is tantamount to an invasion of privacy.  No consumer could EVER have standing to enforce this statute under the interpretation urged by QVC, because no consumer could ever prove an "out of pocket loss" for an invasion of privacy that was caused by receiving an unsolicited prerecorded telephone message.  Any yet the offensive conduct is actionable under *Civ. Code* §1770 (a) (22) without the existence of pecuniary damages.  It would be illogical to prohibit the dissemination of

28

an unsolicited prerecorded telephone message and then require the consumer to purchase the product to make this CLRA violation actionable.  This is why the CLRA is a strict liability statute and the requisite "damage" for standing purposes is the violation of the statute itself.

Similarly, no "out of pocket loss" may exist when a retailer misrepresents the reason for reducing its product pricing in violation of *Cal. Civ. Code* §1770(a)(13) because of a  "Going Out of Business Sale" that won't occur for another 9 months, 2 years or really doesn't exists at all. If a consumer makes a purchase based on that misrepresentation, does it violate the CLRA, *Civil Code* §1770(a)(13)?  Yes.  Is the violation actionable without pecuniary damage?  Yes, because the statutory structure of the CLRA allows for **equitable actions** to exist and be maintained for violations that create minimal or no recognizable pecuniary damages. (see, *Cal. Civ. Code* §1780 - injunctions[12], disgorgement, and rescission are available without pecuniary damage).

In the instant action, Mahfood bought the subject products in reliance upon the comparative pricing of the products and arguably suffered damage as more fully discussed, *infra*.  As a direct result of these wrongful comparative-pricing practices and/or QVC's failure to conspicuously disclose material limitations to QVC's deceptive practices in violation of Section 1770, Mahfood did suffer her aforementioned harm and is entitled to recover under her CLRA claim.

In the case of *Meyer v. Sprint Spectrum L.P.*, 150 Cal.App.4th 1136 (Cal.App. **Dist. 4, Div. 3** 05/17/07) (*Meyer*), Review Granted on other grounds, the California appellate district ruled that a plaintiff does not have to allege a monetary loss to have

---

[12]      " 'It is settled that the voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere violation of a party the challenged practices may be resumed.' " (*United Farm Workers of America v. Dutra Farms* (2000) 83 Cal.App.4th 1146, 1164 citing *Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 929.)  Other circumstances may be weighed, including the **adaptability or transferability** of the unfair practice to other products. (See *F.T.C. v. Colgate-Palmolive Co.* (1965), 380 U.S. 374, 395.)

standing under the CLRA (*Meyer* Slip Op. at p. 2). The *Meyer* court follows the rule on standing as set forth by the California Supreme Court in *Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 587 (*Kagan)*. In *Kagan,* the plaintiff <u>was damaged</u> even though she personally **suffered no pecuniary loss**, because she opened an account at Gibraltar rather than some other bank as a result of material written and oral misrepresentations (*Meyer* Slip Op. at p. 15).

On August 15, 2007, the Supreme Court granted review of the *Meyer* Case on the following issues: (1) Has a person suffered "damage" within the meaning of the Consumer Legal Remedies Act (*Civil Code*, section 1780, subd. (a)), such as to allow that person to bring an action under the Act if that person is a party to an agreement containing an unconscionable term (see *Civil Code*, §1770, subd. (a)(19)), even though no effort has been made to enforce the unconscionable term? (2) Did plaintiffs have standing to seek declaratory relief?  The issues on review to the Supreme Court in the *Meyer* Case are directed to a standing issue under a CLRA claim when a party has <u>not been exposed</u> to a violation of the provisions of *Civil Code*, §1770.  These issues on review are a) <u>distinguishable</u> from the facts of the instant case, wherein Mahfood's existing harm in viewing, relying upon and entering into a sales transaction is based directly on QVC's comparative pricing disclosures and/or omissions, and b) do not impact on the Supreme Court's *Kagan* Rule that is followed in the *Wang* Case and reinforced by this district's appellate court in the *Meyer* Case that when a person <u>is subjected to</u> a violation of *Civil Code*, §1770 (as Mahfood has) no monetary loss is required to have standing under the CLRA.

QVC cites *Wilens v. TD Waterhouse Group, Inc.*, (2003) 120 Cal.App.4th 746, 754-755 in an attempt to distinguish *Kagan*.  However, the issue in *Wilens* was not what *Kagan* stated about the requirement for "any damage" in order for an individual to have <u>standing</u>, but whether *Kagan* stated that each member of a purported class need not have suffered actual damages. (*Ibid*.)  *Wilens* was simply <u>not</u> a standing case and did not distinguish the statement in *Kagan* that "the requirement of section 1780 that a consumer

'suffer[] any damage' . . . include[s] the infringement of any legal right as defined by section 1770." (*Kagan*, supra, 35 Cal.3d at p. 593; *Wilens*, supra, 120 Cal.App.4th at p. 750.) Thus, our Supreme Court has interpreted *Civil Cod*e §1780 to state that the infringement of a legal right provided by *Civil Code* §1770 that results from the violation of *Civil Code* §1770 is damage enough to provide standing.

The *Wilens* court did **not contradict** the *Kagan* Rule, discussed *supra*, but rather distinguishes the *Wilens* case on the rationale that <u>proof of causation for all putative class members</u> could not be established on a class wide basis by presumed reliance. As such, the appellate court upheld the trial court's finding in a motion for class certification that individual damages issues would predominate over the common issue of whether the termination provision is unconscionable where **reliance could <u>not</u> be presumed** for each class member. (*Id.* at p. 755)  The *Wilens* court was analyzing the entitlement to damages as a standing issue based on the finding that the unconscionable termination provision may <u>not</u> have caused harm to all putative class members.  QVC's citation to other cases that rely upon lack of harm equally fails because harm does exist in the instant case.

QVC's reliance on the case of *Chamberlan v. Ford Motor Co.*, 359 F. Supp. 2d 1138, 1147 (N.D. Cal. 2005) is short cited.  The *Chamberlan* court was discussing the facts of the particular case that class members' plastic manifolds have suffered more degradation than manifolds made of aluminum to establish damages as a standing and remedial issue.  This discussion was preceded by the court's statement that [t]he plain language of the CLRA does not require that consumers suffer particular pecuniary losses in order to bring a CLRA claim. *Id*. at p. 1147.

QVC's reliance on the *Lozano* and *Lee* cases that cite the *Wilens* case holding a court may not presume damages based on the mere insertion of an unconscionable clause in a contract are equally inapposite because action was taken by Mahfood as a direct result of the comparative pricing disclosures at issue. In both *Lozano* and *Lee* cases, the unconscionable clause had not been enforced and therefore had no effect on the

1 Plaintiffs.

2     As discussed *supra,* Mahfood's reliance and action taken on the comparative

3 pricing disclosures has resulted in harm and damages.  In the instant case, **causation**

4 **exists** by Mahfood purchasing her products in direct and justifiable reliance upon

5 QVC's expressed comparative pricing disclosures and/or omissions of material facts

6 regarding the same that are likely to mislead and/or have misled Mahfood.

7     QVC overstate its reliance on the case of *Colgan v. Leatherman Tool Group, Inc.*

8 (2006) 135 Cal.App.4th 663 by **not** informing this court that the discussion on the issue

9 of damages (*Id.* at p. 695) was remedial in nature and **not** as a standing issue.

10     QVC's reliance on *Chavez v. Blue Sky Beverage Co.*, 2007 WL 1691249 (N.D.

11 Cal. June 11, 2007) fails to recognize that the reason no injury in fact was established in

12 that case was because the promises had <u>no</u> value. *Id.* at * 3 – Plaintiffs have not alleged

13 damages resulting from Defendants' supposed misrepresentation of its bottling location

14 and/or corporate headquarters.  In the instant case, Mahfood's damages are the direct

15 result of the expressed comparative pricing disclosures (Retail Value, QVC Price and

16 IP), which create a direct establishment claim of a monetary savings, benefit or **value**.

17     *(e) Mahfood Can Prove Injury in Fact Under the CLRA and/or UCL*

18     Notwithstanding that Mahfood has satisfied the proper criteria for standing and/or

19 entitlement to assert a CLRA claim by suffering the infringement of a legal right as

20 defined by Section 1770, Mahfood has also sustained an injury in fact and loss of money or

21 property under her CLRA and/or UCL claims.

22     In prior cases requiring interpretation of new statutory language, the California

23 Supreme Court has determined that an "examination of various dictionary definitions of a

24 word will no doubt be useful" in determining its ordinary meaning, (*MacKinnon v. Truck*

25 *Ins. Exchange* (2003) 31 Cal.4th 635, 649), so long as the court undertakes that

26 examination from the viewpoint of the electorate in enacting a statute that contains the

27 word. (See, *Ibid.*; *Knight v. Superior Court* (2005) 128 Cal.App.4th 14,23.) An injury in

28 fact is "[a]n actual or imminent invasion of a legally protected interest, in contrast to an

invasion that is conjectural or hypothetical." (Black's Law Dict. (8th ed. 2004) p. 801.) To lose is to "suffer deprivation of." (*Id.* at p. 1338.) Loss is the "undesirable outcome of a risk; the disappearance or **diminution in value**." (Black's Law Dict. (8th ed. 2004) p. 963.)

Mahfood has sustained an **injury in fact** by making an urgent retail purchase of the subject products from QVC as a result of viewing and reliance upon QVC's comparative pricing disclosures (causation). As discussed *infra*, these comparative pricing disclosures are likely to mislead and therefore an actual invasion of a legally protected interest under *Civil Code*, §1770(a) (5), (9) and/or (13) and/or under the deceptive and/or unlawful prongs of Mahfood' UCL claim. Mahfood further sustained an injury in fact because her reasonable expectations were not met by QVC and she experienced a loss of buying power in not being able to purchase the products from other retailers.

Mahfood has sustained a **loss of her out of pocket money** that includes the selling price of the subject products **and/or the quantifiable <u>consequential</u> costs** consisting of shipping and handling charges that she paid directly to QVC in buying the QVC products.[13]   A defrauded party may recover additional damages **<u>even if</u>** no traditional out-of-pocket loss was suffered. (*Stout v. Turney* (1978) 22 Cal.3d 718, 729-730; See, e.g. *Freeman v. Gallery*, No. E039614 (Cal. App. Dist.4/2 11/08/2007) – Consequential costs of driving to store based on advertisement and <u>without</u> making a purchase was sufficient injury in fact and loss of money for standing.)  The statutory phrase in *Civil Code* §3343 "any additional damage arising from the particular transaction" has been understood as referring to "expenses or other consequential injury resulting from the fraud. [Citations.]" (*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 762-763.)   Mahfood's additional payment of **shipping and handling costs** in

---

[13]      One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, **together with any additional damage arising from the particular transaction**. *Cal. Civ. Code* §3343.

purchasing each of the Mahfood products are a direct and separate consequence and a quantifiable <u>monetary loss</u> incurred in reliance upon QVC's alleged misleading advertisement regarding the comparative pricing practices and an ill-gotten gain to QVC.

Mahfood has sustained a **loss of property** based on the **diminution in value** of for each purchased QVC products because 1) the disclosed "Retail Value" for each product is a) significantly in excess of the prevailing market price, b) inadequately substantiated and/or c) untimely monitored, and/or 2) the IP for each product was offered for an unreasonably extended time period with no urgency to purchase. As such, Mahfood received less than what she bargained for in the way of an unequivocal monetary savings or discount.

Finally, Mahfood has produced reliable evidence that the Retail Value for each of the Mahfood products was less than her purchase price. [Mahfood Dec., ¶¶ 3-5, 9-10, & 20; *AOB*, ¶ 14]

### 3.    *The Balance of Hardship Tips in Mahfood's Favor*

A plaintiff can qualify for preliminary injunction **either** by showing a likelihood of success merits and possibility of irreparable harm, or by showing the existence of serious questions on the merits and that a balance of the hardships tips in its favor. [Citations omitted]  *3 Point Distribution, LLC v. CafePress.com, Inc.*, No. SACV 07-0432 AG (C.D. Cal. 02/25/2008)

As more fully discussed *supra*, Mahfood establishes a combination of probable success on the merits and the possibility of irreparable harm to warrant the issuance of the preliminary injunction. Alternatively, Mahfood raises serious questions based on violations of the favored California consumer protection statutes, which only leaves the issue of the balance of hardship tipping in her favor.

In balancing the equities in the instant case, Mahfood refers to her earlier discussion in the section of a Prospective Threat of Harm Continues to Exist.[14]

---

[14]    As stated earlier, the California Supreme Court has determined that "where the legislative body has specifically authorized injunctive relief against the violation of such

As discussed in the moving papers, the Court must consider the public interest as a factor in balancing the hardships when the public interest may be affected. The benefits of Mahfood's requested injunctive relief will accrue to her and the general public in danger of being victimized by QVC based on the same deceptive comparative pricing business practices as Mahfood has suffered. While QVC may have thousands of different products sold to thousands of different California consumers, QVC's deceptive comparative pricing practices are uniformed in nature and implementation creating a **systemic course of dealing**. The issuance of the preliminary injunction will <u>not</u> restrict QVC from selling its jewelry products to the public, but merely prohibits the unlawful use of its comparative pricing practices and/or disclosures to deter misleading the general public.

QVC has viable **mechanisms** for **resolving** its alleged wrongdoing.

[BD, ¶ 96(rrrr)].

[BD,  ¶  96(ssss)].

QVC can obtain the identity of other retailers in the same avenue of distribution that sell the same or substantially similar products, then investigate the selling price of such suitable comparables to determine the prevailing market price or Retail Value for each QVC product based on the market data approach at the time of disclosure. [*AOB*, ¶ 12] Alternatively,

[BD, ¶ 96(uuuu)]. QVC or its Vendors can obtain the prevailing market price or Retail Value from qualified appraisers based on the market data approach at the time of offering the

---

a law, it has already determined (1) that **significant public harm** will result from the proscribed activity, and (2) that injunctive relief may be the **most appropriate way** to protect against that harm." *IT Corp v. County of Imperial* (1983) 35 Cal.3d 63, 70.

products for sale, or by the cost approach with appropriate disclosures made to the public. [*AOB*, ¶ 13]

If QVC contends that the task of complying with the law to adequately substantiate prior to dissemination and/or monitor the "Retail Value" for its merchandise is too great because of the volume of different products that it has to offer and seeks an impermissible exemption from such legal standards, then STOP USING A "RETAIL VALUE" disclosure.  Conversely, to require consumers with significantly less resources and/or knowledge to substantiate at the time of sale the actual retail value of each product based upon a significant number of sales in a representative number of communities is inequitable, especially since QVC have been unable and/or unwilling to do so at the initial time of advertising the retail value for their products and the actual retail value information was readily available to them. With over $1 Billion in annual domestic sales of jewelry products alone, QVC can bear the cost.

Economic fairness requires that this obligation be imposed on QVC.  See, e.g., *In re Pfizer, Inc.* (1972) 81 F.T.C. 23, 61-62.

With respect to the IP disclosures, QVC can modify its existing policy and revert the selling price from the IP to the QVC price within ten (10) consecutive days of initially offering a product at the IP price.  This reversion mechanism is already in place and only needs to be adjusted as to the time frame.

### D.     The Language of the Preliminary Order is Concise and Manageable

FRCP Rule 65 (d) requires that an injunction or restraining order be "specific in terms" and describe "in **reasonable** detail, and not by references to the complaint or other document, the act or acts sought to be restrained." *Reno Air Racing Ass'n., Inc. v. McCord,* 452 F.3d 1126, 1132 (9th Cir. 2006).

Mahfood has drafted the [Proposed] Order For Preliminary Injunction to meet the needs of a specifically crafted order while broad enough to close the loopholes that may be present in QVC attempting to circumvent the spirit of the order.  The phrase "*and/or any other explicit or implicit similar reference price semantic*" is sufficiently clear as to

the usage of other words to describe the designated "Retail Value" or "Introductory Price".  For example, the injunction would consider designations such as "Retail Price" and/or "Other Retailers" as similar to a "Retail Value" designation.   The injunction would consider "Preview Price" and/or "New Product Price" as similar to an "Introductory Price".  These examples are not meant to be exhaustive, but do provide an explanation as to the meaning of the phrase.

The meaning of the phrase "*have in their possession reliable data to prove that adequate written substantiation exists*" consists foremost with the common English language definitions of each word.   The word "reliable" in this context would refer to the same meaning in the context of a non-clinical establishment claim.[15]

In any event, a plaintiff should not be held to answer the wrongdoer's subjective assertion that it cannot understand how best to comply with an injunction. See *Triad Sys. Corp. v. Southeastern Express Co*., 64 F.3d 1330, 1337 (9th Cir. 1995) (holding that placing the burden of determining how to comply with an injunction on the defendant was "appropriate" because it was the defendant who "is the infringer").

### E.    A Minimal Bond Is Required

The language of the preliminary injunction provides QVC with minimal disruption in substantiating/monitoring its Retail Values and/or disclosing its IP for a specific period of time.  The suggested mechanisms to comply with the injunction provide less drastic means of seeking the necessary data than the existing category shop procedures because it allows QVC to establish the retail values through its Vendors, who may also bear the costs of doing business with QVC. The mechanisms to comply with the injunction would **offset** (if not save QVC money) the existing costs of QVC's

---

[15]    Non-clinical establishment claims must be supported by "competent and reliable evidence," which has been defined as "tests, analyses, research, studies or other evidence based on the expertise of professionals in the relevant area, that has been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession **to yield accurate and reliable results**". *Kraft, Inc. v.  F.T.C.* (7th Cir. 1992) 970 F.2d 311, cert. denied, 507 U.S. 909 (1993).

1   existing methods of substantiating Retail Values by category shops.   As for the
2   disclosure period of the IP, QVC would require minimal effort to modify the timing of
3   the reversion from the IP to the QVC, which function already exists.

4   While QVC adopts Mahfood's position that QVC will lose significant sales if it
5   cannot display a Retail Value and/or IP, QVC provides no evidence in the Balliet
6   Declaration of the amount of its potential loss profits from the issuance of the injunction
7   to allow this court to make a meaningful analysis of this factor.

8   Based on the foregoing, Plaintiff requests that a minimal bond be required.

9   ## III.   CONCLUSION

10   QVC's comparative pricing disclosures are a material aspect to Mahfood and the
11   consuming public's decision to purchase products. Construing the CLRA liberally, as
12   required by *Cal. Civil Code* §1760, a reasonable probability of success exists as to
13   Mahfood's CLRA claim.   The CLRA provides for injunctive relief, which at this stage
14   of the litigation will stop QVC from further victimizing the Plaintiff and the consuming
15   public in the same way from the <u>same</u> uniform and deceptive comparative business
16   practices that Plaintiff relied upon in purchasing her products. <u>Enormous offenses call</u>
17   <u>for a greater axe</u>.  Based on the foregoing, Mahfood respectfully requests that this Court
18   immediately issue a preliminary injunction against QVC as set forth in the subject
19   Notice of Motion. Respectfully submitted.

20   Respectfully submitted.

21

22   Dated: June 5, 2008                    By: _____

23                                                MARK BOLING
                                                  Attorney for Plaintiff
24

25

26

27

28

38

PROOF OF SERVICE

1

2

3

I am over the age of 18 years and am not a party to this cause. I am employed in the County of Orange. My business address is 21986 Cayuga Ln, Lake Forest, CA 92630 and electronic notification address is maboling@earthlink.net.

4    On June 5, 2008, I served the following document(s) in this action,

5

6

7

8

9

10

11

12

13
- Plaintiff's Reply to QVC's opposition plaintiff Mahfood's motion for preliminary injunction (redacted)
- Plaintiff's Reply to QVC's opposition plaintiff Mahfood's motion for preliminary injunction (unredacted) conditionally under seal:  confidential
- Stipulation to File plaintiff's Reply to QVC's opposition to plaintiff Mahfood's motion for preliminary injunction (unredacted) under seal
- [Proposed] Order re: Stipulation to File plaintiff's Reply to QVC's opposition to plaintiff Mahfood's motion for preliminary injunction (unredacted) under seal
- Supplemental Declaration of Mark Boling in support of plaintiff Mahfood's motion for preliminary injunction
- Notice of Manual Filing

13

14

by  sending a true copy thereof by **ELECTRONIC SERVICE** pursuant to a court order and/or an agreement between the parties addressed to the interested persons served as follows:

15

16
Attorneys for Defendant QVC, Inc.

17

18
| Robert W. Barnes | Andrew V. Jablon | M. Norman Goldberger |
| rbarnes@rpab.com | ajablon@rpab.com | mgoldberger@hangley.com |

19

20
| Laura E. Krabill | Robyn D. Levitan |
| lkrabill@hangley.com | rlevitan@hangley.com |

21

22
| Co-counsel for | M. Reas Bowman | Clint Krislov |
| Plaintiff Mahfood | reas@krislovlaw.com | clint@krislov.com |

23

24

25

26

The transmission of said document(s) to each party served was reported as complete and without error within a reasonable time after said transmission. I am a member of the bar of the Court in which this action is pending. I declare under penalty of perjury under the laws of the State of California and/or the United States of America that the above is true and correct. Executed on June 5, 2008 at Lake Forest, California.

27

28

_Mark Boling_

MARK BOLING